UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
GIRARD LAFORTUNE,              )
                               )
         Petitioner,           )
                               )
     v.                        )   CRIMINAL NO. 03-10366-PBS
                               )
UNITED STATES OF AMERICA,      )
                               )
         Respondent.           )
_____)
```

**MEMORANDUM AND ORDER**

November 2, 2012

Saris, U.S.D.J.

## I. Introduction

Petitioner, Girard LaFortune, brings this motion pursuant to
28 U.S.C. § 2255(a) claiming that his attorney was ineffective
when she failed to file a motion to suppress statements made
without Miranda warnings.[1] Also, Petitioner seeks to amend his
habeas motion to add two additional claims. First, he claims a
government witness should not have been able to testify that he
witnessed the signing of the inculpatory photographs. Secondly,
he challenges his mandatory sentence imposed pursuant to 18
U.S.C. § 2251 as cruel and unusual. Petitioner's request for
relief (Docket No. 129) is **DENIED**.

---

[1] The Court denied all the claims in the initial pro se petition except
with respect to this claim of ineffective assistance of counsel (Docket No.
135).

## II.  PROCEDURAL HISTORY

On March 31, 2004 Petitioner was indicted on four counts of transportation and attempted transportation of child pornography in interstate commerce in violation of 18 U.S.C. § 2252(a)(1) and (b)(1)(count one); receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2)(count two); possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B)(count three); and, printing or publishing a notice or advertisement for child pornography in violation of 18 U.S.C. § 2251(d)(count four).  Count one alleges LaFortune posted illegal images on the Yahoo internet group "Baldy3"; count two alleges he received such images on his computer; count three alleges he possessed such images on his computer and in his home; and count four alleges he emailed the Baldy3 group soliciting others to post pornographic images.

Prior to trial, LaFortune pleaded guilty to counts two and three. In November, 2005, he went to trial and was convicted by a jury on counts one and four. LaFortune received a sentence of 420 months of imprisonment, followed by 60 months of supervised release. Since LaFortune was a three time offender and convicted of advertising child pornography, 420 months was the mandatory minimum sentence. On appeal, his conviction was affirmed.  See United States v. LaFortune, 520 F.3d 50, 53 (1st Cir. 2008), cert. denied, 555 U.S. 871 (2008) (No. 07-11486).

On August 15, 2006 Petitioner's trial counsel, Syrie Fried, wrote her client a letter explaining that she could not continue to represent him on appeal.[2] In the letter she states:

> My reason for feeling this way is that, after reflection, I am not sure that I provided effective representation during the course of your trial proceedings. Specifically, I feel I may have been ineffective because I didn't file a motion to dismiss the promotion count of the indictment and because I didn't file a motion to suppress your statements to the FBI agents when they came to your house and executed your search warrant.

(Pet'r's Mem. , Ex. 1.) Upon inquiry by the court, Petitioner filed a motion requesting counsel to represent him in this habeas petition. (Docket No. 137.) The court granted the Petitioner's request and appointed counsel. (Docket No. 139.)

### III. STATEMENT OF THE FACTS

**A. Facts Related to Pre-Miranda Statements**

The following facts are largely drawn from the trial record and are not specifically disputed[3] except where stated.

On October 29, 2003, the FBI executed a search warrant at Petitioner's home. (Tr. 2-80, Def. Aff. ¶ 3.) Investigators arrived between 7:30 and 8:00 A.M. (Tr. 2-117.) While most of the agents went inside the apartment to perform the search, FBI agents Todd Richards and David George interviewed the Petitioner in the small common area adjoining his apartment. <u>Id.</u> at 2-

---

[2] Petitioner was also represented by Timothy Watkins at trial.

[3] The government does not concede that all of Petitioner's factual assertions are accurate, although it makes few specific factual challenges.

122-23. Petitioner's apartment consisted of one room, occupied solely by him. (Tr. 2-119-20, Def. Aff. ¶ 2.) During the course of the entire search and interrogation there were as many as seven officers in Petitioner's home. (Tr. at 2-120.) The Petitioner was not read his Miranda rights until nearly 10:00 A.M., about two hours after Agents George and Richards began the interview. (Tr. at 2-125-26, Def. Aff. ¶ 16.) In the interim, the Petitioner stated that he viewed child pornography "quite frequently," that the CDs in his possession contained what "some would consider . . . child pornography," that he is interested in pictures of girls between the ages of ten and fourteen, that he used certain e-mail addresses to trade child pornography, and that he posted specific images of child pornography traded online. (Tr. 2-96-101). He initialed some of the images.

In addition to answering questions, Petitioner was shown the photographs user davyjones20002000 had posted in a Yahoo! group titled "Baldy 3" and was asked whether the photographs were familiar. Id. at 2-97. He answered he was familiar with the images and that he had seen them before because the photographs were "pretty standard internet fare." (Def. Aff. ¶ 10.) Petitioner was then asked to initial the photographs and, as he initialed them, Petitioner claims he was told the "initials meant only that [he] had seen these images." (Def. Aff. ¶ 11.) Agent George testified that the initials meant Petitioner had

acknowledged viewing, downloading, and posting the photograph. (Tr. 2-99.) Petitioner also contends that only Agent Richards was present in the room during the questioning regarding these images and the initialing of the photos. (Def. Aff. ¶¶ 11-12.) He claims that Agent George entered the room to continue the questioning after the initialing of the photographs. (Def. Aff. ¶¶ 12.) Agent George testified that he was present during the questioning and signing. (Tr. 2-97-99.)

During the course of this questioning, LaFortune contends he met with various forms of restraint on his freedom of movement. A police officer accompanied Petitioner when he asked to get his cigarettes, following him to and from his room (id. at 2-128-29), then blocking the exterior door with his body (Def. Aff. ¶ 7). An officer also escorted Petitioner to the bathroom and watched him through the bathroom's open door. (Tr. 2-130-31, Def. Aff. ¶ 8.) Before 9:00 A.M. Petitioner was allowed to use the telephone to call his workplace to say he would not be coming in that day. (Tr. 2-131-32, Def. Aff. ¶ 9.) Again officers escorted him to the phone and watched him make the call. (Def. Aff. ¶ 9.) Throughout the search and investigation, Petitioner's car was blocked by the police cruisers in the driveway. Id.

**B. Facts Related to Petitioner's Conviction**

At trial, the government sought to prove that Petitioner posted certain child pornography images to an internet Yahoo! group site, and an email message encouraging members of the Yahoo! internet group to post further images. The government introduced the following evidence:

Agent Kari Morales Marsh, a member of the Innocent Images Task Force, testified that during an undercover investigation designed to identify child sexual exploitation, she was invited to join a Yahoo! internet group named "Baldy 3." (Tr. 1-38-46.) Upon entering the group, she received an email that was sent as a message to the entire Baldy 3 group from an individual registered with the username daveyjones20002000. <u>Id.</u> at 1-56. The message subject was titled "As promised" and the message read "Added a few pics in the folder . . . Holly 'n Rim. They're my two favorites. Will post more later. Please post fills if you have." <u>Id.</u> at 1-62. Agent Marsh testified that the word "fills" refers to photos that complete a series of photographs. <u>Id.</u> at 2-15. Agent Marsh never had any direct contact with davyjones20002000. <u>Id.</u> at 2-27.

A representative from Yahoo! testified that when an individual who logged in as davyjones20002000 connected with the Yahoo! database, an internet protocol ("IP") address was recorded for that user – 24.128.242.59. <u>Id.</u> at 2-48,68. An IP address is a

unique number assigned by an internet provider to its subscribers in order to connect the subscribers to the internet so the internet provider can identify them. Id. at 2-37. An IP address is linked to only one given location at any given time. Id. The address stays constant until an individual "logs off" the internet. Id. at 2-39. A representative from Comcast testified that IP address 24.128.242.59 was assigned to a subscriber named Girard LaFortune at 80 Allen Road, Room 1, Billerica, Massachusetts, id. at 2-36-37, Petitioner's longstanding address at the time of arrest. Some evidence suggested that different actions and log-in attempts by the user, davyjones20002000, were recorded with different IP addresses. Id. at 2-54-56, 60-61. During cross-examination, defense counsel's questions suggested a new IP address assigned to davyjones20002000 could indicate that the individual using the davyjones20002000 account was signing in from a different computer at a different location. Id. at 2-56-57. This line of examination also suggested that a different IP address meant a different person, not Petitioner, was logging in as davyjones20002000. Id. A representative from Yahoo! conceded that a different IP address could mean that an individual was signing on from a different computer location, but also stated that it does not necessarily mean a different person is logging in. Id. at 2-56-57.

Defense counsel also suggested through questioning that because Petitioner had a cable modem, as opposed to a phone dial-up connection, his IP address would not change because cable modems remain constantly connected to the internet. Id. at 2-39, 3-42. This line of questioning was meant to suggest that if Petitioner's cable modem connection is always constant, his IP address would remain constant, so any different IP address associated with the davyjones20002000 account could indicate another individual logging into the username from a different location. A computer forensic expert for the government testified that each time an individual logs on and off the internet, he can be assigned a new IP address. Id. at 3-41-42. Even if an individual has a cable modem that is constantly connected to the internet, he testified that the service provider can log you on and off, reassigning a different IP address to the same computer at the same location. Id. at 3-42-43. The defense did not present its own expert witness.

The government introduced evidence of the documents and pictures seized at LaFortune's home during the search in October of 2005. The investigators found a laptop computer as well as a cache of CDs, disks and other computer media hidden behind a ceiling tile over petitioner's bed. Id. at 2-71-72. One of the CDs was labeled "Rim Holly." Id. at 2-107. On that CD were images of child pornography, including the same images with the same

file names as those images posted by the user davyjones20002000 in the Baldy 3 Yahoo! group. Id. at 2-113. Significantly, investigators found print-outs of emails from Yahoo! groups sent by the user davyjones20002000, id. at 2-109, as well as a ledger book that catalogued all of LaFortune's child pornography DVD collection, id. at 2-110.

### III.  STANDARD OF REVIEW

Under 28 U.S.C. § 2255, a defendant may seek post-conviction relief from his sentence in four instances: if the sentence "(1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." David v. United States, 134 F.3d 470, 474 (1st Cir. 1998) (citing Hill v. United States, 368 U.S. 424, 426-27 (1962) (construing Section 2255)).  The claimed error for which a party requests relief must be "a fundamental defect which inherently results in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185 (1979) (citing Hill, 368 U.S. at 428).  "Section 2255 is not a surrogate for a direct appeal." David, 134 F.3d at 474.

## IV. DISCUSSION

### A. Ineffective Assistance of Counsel

Petitioner claims that he is entitled to post-conviction relief because he was denied his Sixth Amendment right to effective counsel when his attorney failed to file a motion to suppress evidence gathered in violation of his Fifth Amendment rights. In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) the Supreme Court articulated the familiar two-part test to determine whether an attorney's performance in a particular case fell below the constitutionally required minimum. First, the defendant must show that counsel's performance was so deficient that it "fell below an objective standard of reasonableness." <u>Id.</u> In reviewing the performance of an attorney, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" <u>Id.</u> at 689 (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)). In order to be deemed deficient performance, counsel's choices must be "so patently unreasonable that no competent attorney would have made [them]." <u>Knight v. Spencer</u>, 447 F.3d 6, 15 (1st Cir. 2006).

Second, the defendant must demonstrate that "the deficient performance prejudiced the defense." <u>Strickland</u>, 466 U.S. at 687.

This requires a showing that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "In other words, prejudice requires 'a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" Yeboah-Sefah v. Ficco, 556 F.3d 53, 70 (1st Cir. 2009)(quoting Strickland 466 U.S. at 695).

The Petitioner must prove both elements by a preponderance of the evidence.  Gonzalez-Soberal v. United States, 244 F.3d 273, 277 (1st Cir. 2001).

### 1. Deficient Performance of Counsel

Petitioner argues that his counsel was deficient in failing to file a motion to suppress these statements based on the alleged Miranda violation.

"A person need not be under arrest for Miranda rights to arise, but he must be in custody." United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011) (internal citation omitted). The "ultimate inquiry" when determining whether a defendant was in custody during an interrogation "is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (quotation omitted); see also United States v. Fernandez-Ventura, 132 F.3d 844, 846 (1st Cir. 1998). This inquiry is informed by considering the "totality of the

circumstances," <u>Thompson v. Keohane</u>, 516 U.S. 99, 113 (1995),
and asking whether in light of the circumstances of the
interrogation, "a reasonable person [would] have felt he or she
was not at liberty to terminate the interrogation and leave," <u>Id.</u>
at 112.

The First Circuit has identified four factors to consider
when making a determination of custody, including "'whether the
suspect was questioned in familiar or at least neutral
surroundings, the number of law enforcement officers present at
the scene, the degree of physical restraint placed upon the
suspect, and the duration and character of the interrogation.'"
<u>United States v. Mittel-Carey</u>, 493 F.3d 36, 39 (1st Cir. 2007)
(quoting <u>United States v. Masse</u>, 816 F.2d 805, 809 (1st Cir.
1987)). This list is not exhaustive, nor is any single factor
necessarily dispositive.

Among these factors, the element that carries the most
weight in the determination of custody is the level of control
officers exerted over the defendant throughout the course of the
interrogation. <u>See</u> <u>Mittel-Carey</u>, 493 F.3d at 40. From the moment
police officers arrived at LaFortune's rooming house, he was not
permitted to move about his home without an escort. (Tr. 2-129-
30; Def.'s Aff. ¶¶ 6-8.) A police officer followed him outside
for a cigarette break. (Tr. 2-128-30; Def.'s Aff. ¶ 7.) He was
accompanied to the bathroom while a police officer stood outside

the open door. (Tr. 2-130-31; Def.'s Aff. ¶ 8.) A police cruiser

blocked in his car from leaving the premises. (Def.'s Aff. ¶ 9.)

There is some dispute as to whether police officer's told

Petitioner he should inform his boss he would not make it into

work that day, (Def.'s Aff. ¶ 9,) or whether the officers simply

did not encourage Petitioner to attend work when he requested to

call his employer, (Tr. 2-131-33.) However, it is uncontested

that when Petitioner made this call, he was, once again, escorted

to the phone and watched by police. (Def.'s Aff. ¶ 9.) Indeed,

one of the interrogating officers who testified at trial agreed

that the only way Petitioner could move around his home was with

an escort. (Tr. 2-131.)

The government argues that the very fact that LaFortune was

able to take a cigarette break and walk around in his own home

indicates he was not prohibited from going anywhere or doing

anything he requested. It is true that an interrogation in a

dwelling is less intimidating than one in a police station. See

United States v. Hughes, 640 F.3d 428, 435-36 (1st Cir. 2011)

("Though questioning in a suspect's dwelling may at times

comprise a custodial interrogation, such a location generally

presents a less intimidating atmosphere than, say, a police

station." (internal citation omitted)). However, "a deprivation

of freedom can as readily take place in one's home as at a police

station." United States v. Goodridge, 945 F. Supp. 359, 365 (D.

Mass. 1996) (citing Orozco v. Texas, 394 U.S. 324 (1969)). During the search, Petitioner's home was occupied by as many as seven armed police officers at one time. (Tr. 2-120.) Additionally, LaFortune's residence was made up of only one room. (Tr. 2-119-20.) While seven officers is not an inherently overwhelming number, and the guns were not drawn, when confined to such limited quarters, seven officers could "dominate the scene" in a manner risking the coercive effects Miranda sought to avoid. See United States v. Melendez, 228 F.3d 19, 22 (1st Cir. 2000). Indeed, courts have frequently found that defendants were held in custody within their own home even with a small number of officers present. Mittel-Carey, 493 F.3d at 38 (eight agents); United States v. Widi, 686 F. Supp. 2d 107, 113 (D. Me. 2010) ("only questioned by a couple of officers"); United States v. Mahmood, 415 F. Supp. 2d 13, 17 (D. Mass. 2006) ("Defendant endured questioning 'administered by three agents in a small area.'") (quoting United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003)); Goodridge, 945 F. Supp. at 365 (four officers).

The government also argues that a formal police escort will not always approach a level of restraint associated with formal arrest. See Hughes, 640 F.3d at 436 (supporting a conclusion of no custody because defendant affirmatively refused to answer police questions during a smoking break when officers accompanied him outside). However, watching the Petitioner urinate through

14

an open door intruded on intimate and private activity. Cf.

United States v. Madoch, 149 F.3d 596, 601 (7th Cir. 1998)

(finding that presence of agent while suspect pumped breast milk

in bathroom was sufficient to establish custody). The physical

control over Petitioner in this case is comparable to the level

of control found equal to custody in Mittel-Carey, and, indeed,

the search included one of the same officers on the scene in that

case. 493 F.3d at 38.

The government contends that the control exerted over

LaFortune was a matter of police policy necessary to ensure the

safety of officers and to preserve potential evidence. (Tr. 2-

129-30) However, as the First Circuit held in Mittel-Carey, "if

the government is correct that the agents' actions were necessary

for evidence preservation and officer safety, then it could have

chosen to postpone the interrogation until a non-custodial

moment, or to Mirandize [the defendant]. Either step would have

protected both the defendant's constitutional rights and the

officers' legitimate law enforcement needs." 493 F.3d at 40.

Finally, the search began in the morning before LaFortune

was awake, (Tr. 2-117, Def's Aff. ¶ 3) and the interrogation

lasted for almost two hours before the Petitioner was read his

Miranda rights. (Tr. 2-125, Def's Aff. ¶ 16) In total, the

interview lasted three to fours hours. (Tr. 2-120) There is no

evidence that LaFortune was ever told he was free to leave, (Tr.

2-132-33.)  These remaining factors support Petitioner's view that the police created an intimidating atmosphere that would induce an individual to incriminate himself. <u>See</u> <u>Miranda</u>, 384 U.S. at 457-58. <u>See also</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 665 (2004) (noting that facts such as a two-hour interview when defendant was not told by police that he could leave weighed in favor of a custody finding); <u>Mittel-Carey</u>, 493 F.3d at 40 (finding that ninety minutes - two-hour length of interrogation contributed to custodial status); <u>United States v. Lanni</u>, 951 F.2d 440, 443 (1st Cir. 1991) (factors suggesting custody and restraint included "no statement that defendant was free to leave or terminate questioning . . .[and] the appearance of the officers at 8:00 or 8:30 a.m. . . . before defendant had dressed, eaten, or prepared for the day"); <u>Mahmood</u>, 415 F. Supp. 2d at 18 (stating that a ninety-five minute interview was "significant in length" to support a finding of custody).

Given the totality of the circumstances, the court finds that Petitioner presented evidence of sufficiently coercive elements that could create a custodial interrogation.  The government did not dispute the evidence in any material way. Thus, had counsel filed a motion to suppress Petitioner's statements based on this record, it is likely that the motion would have been successful.

Courts have denied ineffective assistance of counsel claims where trial counsel had a strategic reason for not filing the motion to suppress. See, e.g., Rosenthal v. O'Brien, 814 F. Supp. 2d 39, 55-56 (D. Mass. 2011) (decision not to challenge pre-Miranda statements was a tactical decision consistent with a defense of lack of criminal responsibility). In the case at hand, the government has been unable to articulate any downside to moving to suppress this evidence. Defense counsel, herself, acknowledged she may have been ineffective in not seeking an evidentiary hearing. Indeed, counsel did file and was denied a Motion to Suppress the very same statements as illegal fruits of the search of Petitioner's apartment. (Opp'n to Mot. to Vacate, Ex. A, Docket No. 133.) There appears to be no tactical reason for her failure to move to suppress these same statements on the different ground that these confessions were collected in violation of Miranda rights. Throughout the jury trial, counsel, in fact, made allusions to a Miranda violation. She asked Agent George whether it was true that Petitioner had not been read his Miranda rights until 9:55 A.M., whether Petitioner had asked for a lawyer after being read his rights, and she repeatedly noted when information gained from questioning the Petitioner was acquired before he been advised of his rights. (Tr. 2-123-28.) However, she never formally objected to the statements being admitted on those grounds.

As there appears to be no reasonable strategic reason for a failure to file a motion to suppress Petitioner's statements and since Petitioner's version of events was not materially disputed, no hearing is necessary. Petitioner has proven that the motion would likely have been meritorious, and, so, counsel was likely deficient.

## 2. Prejudice

Next, the court must determine whether the admission of Petitioner's statements to the police prejudiced the outcome of his case. Courts must consider three factors in conducting a prejudice inquiry: "first, the strength of the [prosecution]'s case; second the effectiveness of the defense's case at trial; and third, the effect of the evidence's exclusion in undermining the government's case." United States v. Hebshie, 754 F. Supp. 2d 89, 127 (D. Mass. 2010) (citing Gonzalez-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001).

Even without Petitioner's statements, the government still had overwhelming evidence that a person with the user ID davyjones20002000 had posted and solicited child pornography and that Petitioner was davyjones20002000. See Stephens v. Hall, 294 F.3d 210, 218 (1st Cir. 2002)("'[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'"

(quoting Strickland, 466 U.S. at 696)). First, the government presented evidence from Yahoo! and Comcast records showing that the IP address associated with user ID davyjones20002000 was at Petitioner's residence where Petitioner lives alone. (Tr. 2-33-38, 2-48-68; Def. Aff. ¶ 2.) Davyjones20002000 is the same user who posted child pornography images into a folder labeled Holly 'n Rim to Yahoo! group "Baldy 3" and sent a message to the group suggesting that other members also add their pictures. (Tr. 1-62.) Second, after a search of Petitioner's home executed on the basis of the identified IP address, police officers found a laptop computer on Petitioner's bed, and a cache of CDs, disks, and computer media concealed by a ceiling tile above Petitioner's bed. Id. at 2-71-72. This media included a CD labeled "Rim Holly" with the same images and file names as pictures posted on the "Baldy 3" group, as well as email print outs from the Yahoo! account davyjones20002000. Id. at 2-107-08, 112-14. Finally, the government presented evidence of Petitioner's extensive child pornography collection, including an excerpt from a catalogue of his DVDS, to demonstrate LaFortune was a child pornography collector.

At trial, as described above, counsel suggested that another person could have accessed another computer, logged in to the davyjones20002000 user ID, and posted the pornographic photos without Petitioner's knowledge. This argument is not viable in

light of the evidence identifying Petitioner as davyjones20002000, most notably the emails in his room with that user name. The government presented expert testimony that showed that different IP addresses are generated when a person logs on and off and does not necessarily indicate another individual was hacking into the davyjones20002000 account from a different location. (Tr. 3-42-43, 2-68.) Given the overwhelming evidence identifying LaFortune as davyjones20002000, the Petitioner has not demonstrated that the outcome would likely have been different even if the statements had been suppressed.[4]

## B. Testimony by Officer George

Petitioner also argues that Agent George's testimony regarding Petitioner's signature on the identified photographs should have been excluded for lack of personal knowledge. The government did not respond to the argument. This claim appears to be time-barred. All § 2255 claims must be filed within one year of "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). Petitioner's conviction became final on October 6, 2008 when the Supreme Court denied his writ of certiorari. LaFortune's initial habeas petition was filed on October 5, 2009 — just within the time limit imposed by § 2255.

---

[4] Similarly, Petitioner argues that his counsel was ineffective for not seeking an instruction that it could consider the voluntariness of his confession. It is unnecessary to discuss this claim in light of the Court's ruling that there was no prejudice.

However, the personal knowledge claim was not raised until a motion to amend was filed by Petitioner on December 12, 2011, well after the one-year limitations period expired. Petitioner is attempting to supplement his § 2255 petition with a new theory which had never been raised prior to his motion to amend. In order to overcome the untimely filing, LaFortune's amendment must "relate back" to his original filing. Fed. Rule Civ. P. 15(c)(2).

LaFortune's challenge to Agent George's testimony does not relate back to the original timely § 2255 motion because it asserted "a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Mayle v. Felix, 545 U.S. 644, 650 (2005). See also United States v. Ciampi, 419 F.3d 20, 24 (1st Cir. 2005) (under Mayle, Rule 15 "relation back" principle is to be strictly construed in habeas context). A petitioner's claim of ineffective assistance of counsel does not relate back simply because the original petition raised a claim of ineffective assistance of counsel when the amendment is "based upon an entirely distinct type of attorney misfeasance." Id.

## C. Mandatory Sentences

Finally, Petitioner claims that mandatory minimum sentences are unconstitutional, and thus, the mandatory thirty-five year sentence he received pursuant to 18 U.S.C. § 2251(e) should be vacated. This claim also appears to be time-barred, since the

motion to amend the petition on December 12, 2011, after the one-year statute of limitations under § 2251(f) and does not relate back to the original claims. However, even if considered, the First Circuit has stated that "[t]he mere fact that a sentence is mandatory and severe does not make it cruel and unusual," <u>United States v. Campusano</u>, 947 F.2d 1, 4 (1st Cir. 1991). Sentences imposed may only be vacated in certain situations when the sentence is grossly disproportionate to the underlying offense and "[i]nstances of gross disproportionality will be hen's teeth rare." <u>United States v. Polk</u>, 546 F.3d 74, 76 (1st Cir. 2008). In <u>Polk</u>, the First Circuit upheld application of the very statutory provision under which Petitioner was sentenced. <u>Id.</u> at 78. The mandatory minimum sentence, while severe, was not grossly disproportionate to the offense, particularly in light of the prior record of sex offenses. Accordingly, it was not unconstitutional.

**<u>ORDER</u>**

The motion (Docket No. 129) is **<u>DENIED</u>**.


                                        /s/ PATTI B. SARIS
                                        United States District Judge

22